We're ready for argument in our last case, Streeter v. Wilson. Thank you. Good morning, your honors. Good morning, Mr. Wimbaugh. May it please the court, Mr. Peterson will be following me up after eight minutes as noted. We believe this case demonstrates clearly that the officer used objective reasonableness when he had to make that very quick decision to use deadly force that night. And there's no factual dispute here. Do you accept the facts as pled? We accept for this hearing that the facts must be reviewed in light most favorable to the plaintiff in this case. So that was a yes? There were disputes at trial as to what the facts were. Obviously, if there are factual disputes in a qualified immunity case, we wouldn't have jurisdiction. That's correct. We think this is purely a question of law. So for purposes of this argument, we believe that the lights most favorable to the plaintiff, even with those facts pled by the plaintiff as a matter of law, the use of force was objectively reasonable. You had started a statement, there were disputes at trial. Finish that. Well, the disputes at trial essentially focused on distance and whether or not the plaintiff was armed with a knife at that time. Distance between the officer and the plaintiff? That's correct, Your Honor. And what are the other disputes? The other dispute was whether or not the plaintiff was armed with the knife at the exact moment that the officer discharged his firearm. But for purposes of this hearing, looking at the facts in light most favorable to the plaintiff, it is our position that the officer's decision to use force was objectively reasonable. There is no dispute that the plaintiff had a knife. Just so I understand where you're going with that, because you said there's disputes at trial in those two facts. The plaintiff's evidence on the distance would be? Plaintiff's evidence based upon their expert on the markings that the officer estimated when he did the walkthrough was about 30 feet, maybe a little bit more. The officer testified that he believed that the plaintiff was 20 feet away. But we've got to take the 31. We do. And so the evidence insofar as whether he had the knife at the time in his hand, the plaintiff's allegation was? The plaintiff's allegation was that he had dropped the knife, cast it aside laterally just before he was shot. And what about the statement that at some point, I think there was a statement by the officer that says that the plaintiff said, I don't have it, something's at effect, or I? The plaintiff testified at trial that he said, I do not have the knife. Didn't you see me throw the knife down? That was the testimony at trial. To the officer? To the officer. And they're 30 feet apart? According to the plaintiff and the markings, yes, Your Honor. Do we take it that the officer heard him? The officer did not hear him, according to the officer's testimony. For our purposes today, don't we have to assume that he did? No, I don't think you do. What about the testimony from the victim's mother that she told him, told the police officer in advance of the shooting not to shoot this individual? It's my son, it's not the assailant. I don't think whether or not it's her son or the assailant is crucial to this case. What is crucial to this case? But the question was, we have to assume for our purposes today that those are true factual allegations. I think looking at the testimony in its entirety was that she probably told Officer Helms, the second officer, that in fact that's her son, and that Officer Wilson was further on down the road away from the mother. We have to accept the fact that she said it. We accept the fact that she said it. But to whom is an issue that the trial judge did not resolve in favor of one person or another? Whether or not it was her. Correct. A factual dispute. Creating a factual dispute. Creating a factual dispute, but in the order that the judge put forth, that was not resolved in favor of the plaintiff or the defendant at that time. I don't think it's a crucial factor. What's crucial is that he's armed, that he refuses to drop the knife, and he continues to. Well, the reason I guess so much time is being spent on this is in order for us to have jurisdiction at this point, we have to accept some statement of facts as given. So we're trying, or at least I'm trying to understand, I'm trying to assure for us to have jurisdiction that we're all operating on the basis of the same facts. And those facts are the facts as pled, and taken in the light most favorable to the young man, Sutton and Ms. Streeter. So those facts are, and tell me if I'm getting any of them wrong, that the mother did say, don't shoot, that's my son. I don't think there's any indication of whether or not she was hurt or not. That JG was 31 feet away. Correct your honor. Not 20. And what are the facts with respect to JG having the knife at the time the shots were fired? According to the plaintiff, the facts were that the knife was cast aside just prior to the shots being delivered. But that's what we have to take. I agree, your honor. I agree wholeheartedly. Given those facts, based upon what occurred just prior to the shots being fired, was that there was a figure. There's no dispute that two figures were approaching the officer. One of them was carrying a shiny object. The officer repeatedly yelled to drop the weapon, drop the weapon, drop the knife. And yet, the figure moves forward. At that moment, our contention is that the plaintiff is an immediate threat, not only to the officer. Of course, in the facts that Judge Duncan just recited, the knife is gone. But just prior to the knife being cast aside, like the incident in Sigmund, it would be reasonable for an officer not to see that. And when it comes to reviewing whether or not the force is lawful, we now kick into the Graham analysis. But in Sigmund, if I'm remembering it correctly, the assailant and the police officer were closer than you and I are. They were, but the assailant didn't continue walking forward, sending out the message that he would not comply. Failure to comply and not drop a weapon and not immediately follow those officers' commands over a repeated series of distance is sufficient to make that threat immediate and apparent, whether it's 20 feet or 30 feet. It all factually depends. What about 50 feet? In some circumstances, 50 feet would be, Your Honor. Immediate. Immediately, and for example. What makes it a matter of law, from your perspective, that 30 feet would be? The totality of the circumstances, the failure to respond to the officers' repeated lawful commands to drop the weapon indicates, Your Honor. Would you agree, following Sgt. Wynne's question, that what we would have to find is, as a matter of law, in these facts, that that was an objective? I would, Your Honor. The problem that I have on the facts is, and you rely on the existence of exigent circumstances, immediate response, but there were, in fact, four shots. And even if we were to conclude and agree that Wilson could reasonably have perceived J.G. as a threat prior to the first two shots because J.G. was far away, approaching, holding a knife, being belligerent and noncompliant, how does that, how can we find that the latter two shots, including what the officer himself described as a kill shot, when J.G. was 30 feet away, standing still, and you can see unarmed? There was a, this is not a case in which there are four shots fired in rapid succession. This is a case in which there was a break in the action and the officer had time to stop and reassess before firing the kill shot. Your Honor, I submit to you that he did reassess, and based upon his perspective, he found that the plaintiff was still an eminent threat. Even though he was standing still, he was 30 feet away, he was standing still, he was at that point unarmed. Your Honor, I would, as far as the issue of unarmed, we will have to stand by Sigmund because he had previously been armed right up to that point, so it was reasonable for him to believe, even if he was mistaken. Standing still and staring at somebody is, in fact, one of the precursors that many people use before they charge forward again. But that's why you have to tack on immediate. And in this particular circumstance, if you look at the totality of the circumstances, it happened incredibly fast for the officer to make the decision. What the officer relied on was the past objective behavior. What a reasonable officer will rely upon is the behavior that leads up. The failure to comply, particularly dropping the weapon, is crucial. Continuing forward is crucial. Therefore, it is reasonable for that officer at that time to believe that he's an immediate threat, even if he had dropped the weapon, because the officer may not see it due to the fast-changing circumstances under which this occurred. So I want to go back to this 31.5 feet, I guess it is, as opposed to the 20 feet and the questions that Judge Duncan and Judge Agins alluded to in terms of the fact that we have to determine that as a matter of law this existed at 31 feet. The basis, as I understand, for maybe 20 feet, is there is some evidence or at least some expert testimony or something there that says that 20 feet with a knife or you're in danger within 20 feet. It's called the 21-foot rule, and there was evidence at the trial. And it's based on something. It's based on more than just I feel like it or a court felt like it. It's really based on experience or some type of testing, isn't it? It's based on a stopwatch, and what it showed was the amount of time it takes for an adult male to move forward 21 feet to get to a target. It does not take into consideration what the expert also noted in the trial, that simply because somebody is struck, and I hate to talk about these type of things, but struck center mass does not mean that person stops. And the facts in this case, it's absolutely clear. Well, the question then goes, we're talking at 20 feet, you've got this evidence that's based upon whatever the basis is, maybe experience of years. But 31, we begin to move into maybe as you probably recognize, it's got to be somewhere gray you begin to move into at 50, at 100 feet or 200 feet with a knife. And to pull out a gun and to shoot at that time. And you said an adult male, and this plaintiff was 15 years old. He was, but the 21-foot rule I think is a red herring in this case. It's the totality of the circumstances. Distance is certainly part of it, but if somebody was 50 feet away from a playground, walking towards a playground, carrying a machete and cursing, should an officer wait until they're 20 feet and risk the fact that they could miss? But he's not carrying a machete, he's carrying a kitchen knife, I guess. He's carrying a large boning knife. And the facts of this instance says he doesn't even have the knife. It also says he's yelled out, basically, I don't have it. And under his facts, he's only 30 feet away. The officer is in a position to hear this. And he shoots a gun at someone who has a knife who's 15 years old. That's not good. It's not a good situation whenever a firearm is discharged. But the person who put this into play, and this is where Scott versus Harris has some relevancy, the culpability of how this got into play was he picked up a knife. He made the decision to walk down the road. All of our discussion here does not end this. I mean, it doesn't mean that the plaintiff is going to win this case. Where we are dealing with legal issues, at what point does the court take this out from the factual determinations by a jury? And that's kind of where we are right now. I mean, if you argue this case as though, whatever we decide here, oh, it's going to be the end of it. Oh, it's not. Clearly not, because wasn't there a trial actually that did not end? So, I mean, even based on this, it was close. It doesn't mean it's the end of this. I agree with the court. This is the end. And there are several policy arguments that come into play, which are noted in both briefs, and I won't go over. But, Your Honor, I think the question of law is, and looking at the totality of the circumstances, which is refusing to drop the knife, moving forward and cursing, as a matter of law, is it objectively reasonable for that officer to find that that's an immediate threat in this particular case? To what extent do we consider the trial judge in this case who is in a position, he's very active in this case. He's asking a lot of questions. He's not being light on the plaintiff either in terms of what's going on here. And he's hearing all this evidence back and forth, and he decides, I can't make this determination as a matter of law. And now it comes to us, and we don't hear all that. How do we resolve that? How do we convert something that we just don't have that 20 feet basis? And I understand you say it's a red herring, but that red herring had something going with it, more than just I feel. How do we deal with that? First of all, we all have utmost respect for the judge in this case. In due respect, he focused primarily on the distance. Our position is you must focus just before the shots were fired, what activity the plaintiff was participating in, which was carrying a knife, refusing to drop it repeatedly. Each step forward, each command heightens the immediate threat. If somebody were to walk into this room right now with a knife in their hand, there would not be one of us that would not have ultimate concern for the safety of people here. Mr. Newball, you are way out of time, and thank you for responding to the court's questions. I believe we now go to Mr. Peterson. May it please the court, Daniel Peterson, also for Matthew Wilson. I appear before the court today to discuss the clearly established prong of qualified immunity as it applies to this case. The central question of this prong always presents in any qualified immunity case that the officer was on notice that his actions were unlawful. This is in a completely independent analysis from the objective reasonableness standard that Mr. Newball was discussing. The cases that plaintiffs chose to cite in their brief are Henry v. Purnell and Brockington v. Boykins. Was it clearly established as a matter of qualified immunity law that an unarmed individual who is not an imminent threat, the deadly force cannot be used in that circumstance? In that circumstance, Your Honor, that would be true. I don't believe that's the facts that we have in this case. I believe that, as Mr. Newball touched on, that the recently armed piece of this is relevant. I believe that there is a... Well, under the facts that we've gone through at some length with your colleague, the victim in this case had stopped their advance. They were over 30 feet away and they were unarmed. And you're agreeing that those are the facts that we have before us now? Yes, Your Honor. So tell us what's not clearly established about the law in that circumstance. Well, harking back to Mr. Newball's position, we make that just like in Sigmund v. Town of Chapel Hill, where the case was resolved in favor of the officer, though I understand the distance was different there. Well, it's not just the distance that was different. The sequence of events was different. In Sigmund, there was a much more compact chain of events. You have to factor in here the fact that two shots were fired and then the officer stopped. And when the officer stopped, circumstances had also changed with J.G. He had stopped and he had thrown away the knife. So the officer here had an opportunity to reassess, change circumstances which didn't exist in Sigmund. Well, Your Honor, I would contend that the drawn-out fashion of the facts is kind of exaggerated by their mere virtue of the fact that in court we sit and testify, or I don't sit and testify, but witnesses testify as to their thought process. And I think there is somewhat of a misconstrual on the fact of the witness's testimony being as it is drawn out. I think it was very rapid. I'm sorry, I didn't mean to suggest that. Oh, no, Your Honor, I didn't mean you were. I thought that the officer himself testified that he paused after the first two shots, reassessed, and decided to take what he called was a kill shot. That's true, Your Honor, and I didn't mean to suggest that you were misconstruing that. I think the officer himself, in the events as you're retelling them, can have, it has a pensivity to draw out that time frame in their own head, is what I was referring to, Your Honor. I didn't mean to imply that you were drawing that out. I apologize. No, I understand. Thank you. But to the point of qualified immunity, the clearly established prong, I don't believe that just hanging on the Graham v. Conner, the Graham analysis is sufficient as to clearly establishing the particular lies right in this area. Well, I believe that rather we have to go with Brosseau v. Hagen, where there was a violent crime scene, which I think that it's important to remember as well, that this was a scene of a stabbing. You have a gentleman with a knife coming at the officer in open air, so to speak. He can go left. He can go right. And though, again, we have to assume the 31 feet, the officer did testify that he perceived him to be closer, and that's not a dispute of fact because we've seen in other cases, including the Gooden v. Howard County case, that a reasonable misperception isn't completely dispositive against the officer as to the objective reasonableness of their actions. We see that in Slattery v. Rizzo and Anderson v. Creighton, I believe, as well. But searing back to the clearly established prong, for a right to be clearly established, it must be particularized at the time, and Brosseau rejected the notion that in all but the most obvious cases that Graham could be relied on as establishing the right. Indeed, in any Section 1983 case, it can be reduced to the Fourth Amendment is clearly established. The protections of the Fourth Amendment are clearly established. On a different tack, this case comes to us in a very odd procedural posture because there's no trial. Yes, Your Honor. And usually the point of asserting qualified immunity is to avoid a trial. Yes, Your Honor.  Well, there is some suggestion that perhaps the officer abandoned the qualified immunity claim by failing to timely raise it. Well, Your Honor, to address that, though it wasn't brought up at summary judgment, when it was first addressed at the close of plaintiff's evidence, renewed at the close of all of the evidence, and then renewed again pursuant to Rule 50B, the first time this court... Right, there was a mistrial. That's right, and the District Court addressed, the first time the District Court and Plaintiffs and Defense Counsel addressed the qualified immunity issue, neither plaintiffs nor the court directed the motion on the basis of the waiver issue. It was a matter of the substance, and at that point, I would argue that there was a waiver of the waiver, so to speak, on behalf of plaintiffs. They didn't raise it at that time? I'm sorry, Your Honor? The plaintiffs didn't raise it? No, Your Honor. And in any event, the failure to bring up qualified immunity until the close of plaintiff's evidence would substantially be harmless in this case because we have a mistrial, and we are substantially at a pretrial stage again. Or a second trial. Yes, Your Honor, that's correct. But just briefly again, just to encapsulate, the Supreme Court in Brosseau talks about how it is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. And in that case, too, there was a fleeing felon in a violent crime scene in a car, albeit, and the officer was in the gray area that Judge Wynn described as the 30 feet of distance in this case, that qualified immunity is designed to protect officers as a matter of law in these gray areas. Again, and I think that's where the clearly established prong really allows the court to find for the officer in this case, regardless of what the court thinks as the objective reasonableness part. Because I do think, as has been acknowledged by the court members this morning, that there is somewhat of a gray area, an uncomfortable feel to the distance in this case. And so, at very least, it is not clearly established, though, one way or the other. That's if we do not accept the judge's statement that under these circumstances, at least in the light most favorable to the plaintiff, that there was no threat, imminent threat of bodily injury at the time that this occurred. Yes, Your Honor. You're not, I think, you would accept it's clearly established that you're not entitled to use deadly force under those circumstances. That's correct, and that's what the Supreme Court notes in Brassell, I believe, as well. And this court, in Henry v. Purnell, discusses briefly, well, in that case, the officer conceded that a gentleman intending to reach for his gun and shooting at a fleeing misdemeanant was clearly established. And that's the clearly established piece of that, firing at a fleeing misdemeanant, not the fact that taking one step back from that in the Graham analysis as the imminent threat of physical harm. So I would argue that... Even in the context of that case, when we look at these cases, it seems almost disingenuous to consider a gun, the threat of a gun, to be equivalent to a knife, kitchen knife, of a 15-year-old holding it almost 32 feet away. Well, Your Honor, I'm not... And he's stopped. I mean, he's not. So I guess the thought is he may have the skill to throw it or something, or... No, Your Honor. I believe what the evidence showed in that... Come on. I'm sorry. Just tell me a little bit about that, because I'm... At 20 feet, I guess I'm thinking someone's really skillful enough, you could arm him, you could reach him pretty good with that, or maybe get there quick enough to do the damage. When you get to 32 feet, what is the thought? Is he that fast enough he's going to run, and you won't have time to shoot him before he gets there, or he'll throw it up? How is it... The thought process is on a charge on getting past the officer, because we have a stabbing victim behind him, even accepting the plaintiff mother's comments on the... And I see I've reached my time. Please finish the response to the question. Yes, Your Honor. And I see that despite the plaintiff mother's comments to that, to the effect that this was her son, that doesn't change the circumstances between he and the plaintiff. I'm not going to beat it, but I'm just trying to understand. A gun is easy. You take that gun 30 feet away, you can shoot. I mean, that bullet goes pretty quickly. But a kitchen knife in a 50-year-old hand 32 feet away, what is, as a matter of law, what is the imminent threat that we must find as a matter of law? Well, Your Honor, the fact that it's 15 years old, I'm not sure. I mean, again, officer, let's not get hung up on this. Just that little specific thing. What is he going to do with this knife? Is he going to run? Is the imminent threat that he's going to run over there with it and stab him, or is he going to throw it? How is it going to happen? It could run either at the officer or run around the officer. It's dark. There are houses around. In fact, when he fled, after the shots were fired, he fled behind the houses and he had been hit, so he did cover a fair amount of distance. He covered over 50 feet, in fact, when he was actually after being shot. So there is some indication that he could have moved forward or laterally sufficiently enough to reach out at the officer, the stabbing victim behind him, or other officers and emergency personnel. Does that address your question, Your Honor? It does. Thank you. Thank you very much. We will now hear from Mr. DeVore. Thank you, Your Honor. May it please the Court, Will DeVore on behalf of JG. Your Honors, based on the case law that I've reviewed prior to this hearing, you've been on the panel and heard qualified immunity before. I think that you're DeVore the third, not the fourth. I'm the fourth. You're the fourth. The third is sitting behind me right now. All right, good. I don't know which DeVore I'm talking about. Conveniently sitting behind me. Your Honors hit on pretty much all of the important points that I brought up in my brief, and the first threshold issue I think we have to answer is whether this is proper before you today. All three of you hit on the two parts that concern me. The first one is from the Supreme Court case of Mitchell v. Versailles, which Your Honor Duncan gave the opinion in IKO v. Shreve that talked about Mitchell v. Versailles. What Mitchell v. Versailles said was that qualified immunity is an immunity from suit rather than a mere defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. Are you going to argue waiver? I am, Your Honor, and I do believe that they have waived the immunity aspect of it because the whole purpose of, from the cases I've read. When did you raise that issue? We didn't raise it at the trial. Well, in fairness, the officer didn't raise qualified immunity. Is this correct? Prior to this trial? And Your Honor, that is correct. They raised it, I believe, initially. Wait a minute. I thought the opposing counsel said that he raised the issue at the conclusion of the plaintiff's evidence. That's true, yes, yes, and then renewed it afterwards. Thank you. What's concerning also about that is that in the city of Charlotte's answer, they answered this was their qualified immunity defense in their answer, what they pled. To the extent permitted by applicable laws, plaintiff's claims are barred by the public duty doctrine, statutory, and or common law immunity. They never specifically pled qualified immunity, never amended, and subsequently after. But if you didn't raise it in the district court when they raised it, you didn't raise the objection that it was waived when they did raise it in 5850B, why do you get to raise the issue now? Why would you waive it? Your Honor, I didn't find any case law that supported the theory that I had waived it since the burden was on the city to establish the qualified immunity early in the summary judgment stage or in the motion to dismiss stage to prevent officers from having to go through unnecessary trial litigation, two years of expert testimony. Well, now we have a second trial. So the officer is now trying to avoid being put to defense in a second trial. Yes, Your Honor. Why wouldn't that settle the issue? I believe the reason why is because of points that you've made to the appellant earlier on, which is that after the trial, there are now tons of factual disputes. There are now, as opposed to a summary judgment or motion to dismiss where you present the evidence you've got. The trial two would be a trial de novo, is that correct? I'm assuming there are no stipulations or agreements among the parties that certain evidence from the first trial will be taken. So if it's a trial de novo, what force does your argument have on a waiver? Other than, Your Honor, the purpose behind qualified immunity. And we don't have disputed facts for purposes of the motion for qualified immunity. And that brings me to my second point, which is why it's not proper before the court, and that's on Johnson v. Jones, which discusses how the collateral order doctrine basically says if there are genuine issues of fact, the court of appeals cannot hear it. If it's a neat, abstract issue of law, then the court of appeals, it's proper to hear it. And the only thing I'll add to that is that in Judge Cogburn's order, I think he specifically, because he was so involved in this case, wrote a detailed 17-page order. And in that order he said, as demonstrated at the first trial of this matter, there are genuine disputed issues of material facts surrounding Officer Wilson's shooting other than 15-year-old minor plaintiff. But that would be a trial issue, though. I mean, your opposing counsel have answered a number of questions for us where they say, yeah, we agree, we have to take the facts that you pled, that's what we have to go with. And that's a... And the question before us is, taking those facts in your favor, as pled by you, was the officer's behavior objectively reasonable as a matter of law? That is correct, Your Honor. And that leads me to the substance part of their argument, which is there was no clearly established right. That's what they've come here telling you judges, is that no clearly established right existed because there's no specific fact scenario in this situation where an officer could be put on notice that his actions were unlawful. Well, that's one of their arguments. Yes, Your Honor. And my argument to this court, and my argument made in front of Judge Cogburn, is that, and I apologize, before you all came in I stepped it off, and 32 feet, right about approximately where the guy in the red and blue tie, the law student sitting back there... Stand up. Ordinarily we don't allow demonstrative evidence. Just for illustrative, trying to get the law students involved. But that is 32 feet. And so our facts, as supported by the evidence, are that that is the distance J.G. was from the officer at the time the shots were fired. And one thing I didn't hear the City of Charlotte talking about, they talked about the prior acts of J.G., but the standard for clearly established right for qualified immunity is at the time the shots were fired, what was happening. And our facts, in the light most favorable to plaintiff, was 32 feet away. Unarmed. Joint appendix 293, unarmed. He had thrown the knife down. He told the officer he had thrown the knife down. Importantly, when we were talking about... Your Honors brought up Valinda Streeter, his mother yelling at the officer, don't shoot, that's my son. The evidence in the case was Ms. Streeter was a few feet away from the officer, as close to where the witness stand was to the jury box. And in fact, she was so close, I remember her testimony vividly, that she could see the fire come out of the gun. So, you've got an officer, a reasonable officer, hearing, and also prior to the shooting, Officer Helms... Well, we don't know that the record establishes that he heard it. We don't. But in light most favorable to the plaintiff, the evidence before the court was that she was yelling it from a few feet away. Also, before the evidence at the trial, was that at least 30 seconds to a minute prior to the shooting, Officer Helms had radioed, which we established that same division, he would have gotten the incoming transmission on his shoulder, radioed that the suspect had already fled, and had already fled the scene in a bronze Honda Accord, and the weight of the suspect was 240 pounds. This kid was about 115 pounds at the time. Also, you know, again, JG was stopped. That's joint appendix at 147. And I think that's the crucial component to this case. I really do. And that's what we argued a lot in trial, and what I'm arguing before you today. When you look at, in my opinion, the two main cases for the city of Charlotte is Sigmund versus the town of Chapel Hill, and also Anderson versus Russell. In both of those cases, they found qualified immunity for the officer. What I found is kind of a theme in all these qualified immunity cases, and that theme is where there is an overt or aggressive act by the suspect, given the proximity of the suspect to the officers, that a reasonably trained officer would believe there to be an imminent threat of serious bodily harm or death to himself or others. What would happen if, in your case, the facts changed so that they presented the trial evidence, they made the qualified immunity motion, and the expert that had testified as to distance at 30-some feet was then recalled to the stand by the defense and testified after your expert had testified on the 21-foot rule that I made a mistake in my calculations, I just discovered it, and indeed the officer's testimony was correct. It was 20 feet inside the 21-foot rule. How would that affect your case today? In all honesty, Your Honor, I don't believe it would, and I believe the evidence before the court, with the defense expert and the plaintiff's expert both agreed the 21-foot rule, that rule has been misconstrued, and officers aren't even trained. Both experts agreed. Officers aren't even trained on the 21-foot rule anymore because of the misapplication, because every circumstance is different, and if, for example, somebody has a knife, is standing still, and the knife is by his side, and he's 21 feet away, and he's not moving, then the officer in that circumstance, based on the expert testimony, if I recall correctly, that circumstance would not justify shooting. The other important point that the experts made is that this 21-foot rule is with the gun holstered. It is the amount of time, reaction time, that a charging, two important points about the 21-foot rule. It's for when suspects are coming at the officer, and it's for when the gun is holstered. So it's a reaction time for how long it takes to unholster your weapon, give the A-frame position, and fire. And that was where it kind of originated. Based on the trial, the 21-foot rule was talked about on repeat at trial, in this case, the officer testified he was in the A-frame position, gun pointed, flashlight on J.G. from at least 50 feet away, in his estimation, and that it wasn't a matter of pulling his weapon out. He was ready to fire, and I think Judge Duncan brought up a great point that has also been brought up, was brought up in Brockington v. Boykin, which is the point that even if you gave them the benefit of the doubt on most of their argument, the officer shoots twice, pauses, and then the officer admits on Joint Appendix page 77, he admitted that after the first two shots that J.G. was stopped and had it by his side, taking his version of the facts. At that point, he fired two more shots, shooting to kill J.G. So for that reason, the clearly established, whether this was a clearly established right, I believe we all would agree that under Graham and under prior case law like Tennessee v. Gardner or Supreme Court case, that a police officer may not seize an unarmed, non-dangerous suspect by shooting him dead. That's actually a quote from Tennessee v. Gardner, and I noticed that 184 cases have cited that quote. So it's hard to fathom an officer who's put in that exact situation where you've got where the law student was back there. You've got 32 feet, unarmed, and the officer, objectively reasonable officer, believes there's an imminent threat to fire on that child, not just twice, but four times. One very important point that also came out in regards to objective reasonableness and the situation that night, Captain Campagna, and you all read this in my brief, Your Honors read this in my brief, Captain Campagna was the captain of CMPD who trained Officer Wilson. He's trained a lot of officers within the Charlotte-Mecklenburg Police Department. His testimony, in our opinion, was very, very convincing. We asked Captain Campagna in the courtroom, we measured out 32 feet, and we asked Captain Campagna at this distance, and we assumed, if I recall the exact scenario, we assumed that there was a knife in J.G.'s hand. At 32 feet, Captain Campagna, based on your training, how you train your officers, was there any circumstance that you can think of that would justify the use of deadly force? Captain Campagna said, I can't think of any. And when you're talking about qualified immunity and you're talking about objective reasonableness, if the training officer of all of the Charlotte-Mecklenburg Police Department cannot think of a circumstance with a suspect with a knife in his hand from 32 feet away, which the facts don't support, then how can qualified immunity happen in this instance? Along those lines, the Court of Appeals has recently decided a case. The Cooper case, where a man... Which Court of Appeals are we talking about? I believe that was the... You said the Court of Appeals. I thought you were talking about us. I just want to make sure I was right before I say the Fourth Circuit, and then I'm wrong. I don't believe... Judge Winn, you were on that case. See, that's ill preparation. I should have been prepared for that. The Cooper v. Sheehan case, Judge Winn is very well aware of, but again, that was a situation where, in that case, the plaintiff had a shotgun in his hand and went out on his back porch, I believe, to... He heard some commotion. There had been a lot of... The reason the police were called was there was a loud disturbance at the residence, but he went off the back porch, and none of the officers had identified themselves, and he shows up, and he's got his shotgun, according to the facts, I believe, pointed down, and at that time, when he came out with the shotgun, the officer shot to kill Mr. Cooper, and in that case, they didn't find for qualified immunity, and again, I think it came to the point of there was no overt act or act of aggression that would cause an officer, a reasonable officer, to believe there's an imminent threat of danger or death. In Anderson and the two cases cited by the defendant, in Sigmund, he was advancing towards the officers. That was the distinguishing factor, was he was advancing, and also, he was 10 to 15 feet away. In Anderson, the guy raised his hands, obeying the officer's orders, and the officers were 10 feet away, and they believed he had a gun in his waistband, and for no reason, he started lowering, and when he did, the officers shot, and the officers... He was found to have qualified immunity in that case because the officers are 10 feet away. They've observed him for 20 minutes, saw there was a bulge in his pants, confirmed it was basically a gun, thought it was a gun, even though it was an eyeglass case later, but when he made this movement, this overt act, this act of aggression, officers, reasonable officers, are trained to fire in that scenario. In this scenario, unarmed, 32 feet away, three different sources telling him that either that's my son or the knife's been dropped. Based on the light most favorable to the plaintiff, I don't believe there's any circumstance that would justify a shooting in this case. Thank you. Thank you. Mr. Anderson? Your Honor, may it please the Court, I'll be brief in my reply remarks. This isn't a case where an individual was just walking down the street with a knife with nothing else going on. This was a case where there had been a stabbing. The officer was heading down to Ms. Streeter's house to begin with because there was a fear that the assailant had harmed her parents. He had somebody else with him, the plaintiff.  That's correct, Your Honor. Nothing came from that individual as to any of these circumstances? It did, Your Honor. He did testify as part of the defense's case. I believe it's in the joint appendix. I can refer to that if you'd like, Your Honor. No, no. In fact, he testified that the minor plaintiff, while approaching, vocally resisted the officer's orders to drop the weapon, drop the knife, by replying, nah, and then cursing at the officer. That there is an aggressive move that indicates a willingness to not comply. Again, though we have to accept that he was unarmed at that point, I do believe that it's similar to Sigmund in that he had just recently dropped the knife. He had laterally dropped the knife and the shots began. On the clearly established prong, as a matter of law, nearly any Section 1983 claim brought under the Fourth Amendment can be boiled down to its foundational principles. However, that is not the inquiry Officer Wilson was confronted with as an approaching or recently approaching individual, one who is verbalizing aggression, one who is actively noncompliant, and Officer Wilson had a stabbing victim and other bystanders behind him. Plaintiff has not pointed to any case law from the United States Supreme Court, this court, or the North Carolina Supreme Court that existed on October 16, 2010. Both Brockington and Purnell were decided in 2011. That would have put Officer Wilson on notice that his decision to use force based on the totality of circumstances confronting him were unconstitutional. I see I've run out of time. Thank you so much, Your Honors. Thank you very much. We will adjourn court for today, come down and group counsel, and then we will come back up and take questions from the students if they have any. This Honorable Court stands adjourned. Thank God, God save the United States and this Honorable Court.
judges: Allyson K. Duncan, G. Steven Agee, James A. Wynn, Jr.